JESSE L. WOFFORD and MARY R. WOFFORD, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Wofford v. Commissioner
Docket Nos. 14004-82, 22367-83, 25482-83, 1712-84, 18613-84, 18881-84, 18882-84, 18883-84, 18884-84, 18885-84, 18886-84, 18887-84, 18888-84.
United States Tax Court
T.C. Memo 1985-500; 1985 Tax Ct. Memo LEXIS 130; 50 T.C.M. (CCH) 1139; T.C.M. (RIA) 85500; September 24, 1985. Lewis H. Mathis and James M. Saxton, for the petitioners. David A. Hampel and Raymond L. Collins, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax as follows: Docket No.
Petitioners
Deficiencies
1976
1977
14004-82
Jesse L. Wofford and
$8,868.53
Mary R. Wofford
22367-83
William G. Campbell
and Norma T. Campbell
25482-83
James H. Nettles and
Betsy M. Nettles
1712-84
Jesse L. Wofford and
$8,621.72
Mary R. Wofford
18613-84
James R. Leach and
4,231.00
Carol S. Leach
18881-84
Calvin M. Bracy and
24,622.71
Melinda M. Bracy
18882-84
Catherine Williams
18883-84
Larry R. Killough and
8,309.59
Mary S. Killough
18884-84
Calvin Bracy and
20,108.00
Melinda M. Bracy
18885-84
Audrey Ann Aldridge
2,269.86
18886-84
Larry Killough and
9,490.30
Mary Killough
18887-84
Audrey Ann Aldridge
1,957.00
18888-84
Catherine Williams
1,140.00
*133 Docket No.
Deficiencies
1978
1979
1980
14004-82
$14,934.15
22367-83
$186,670.00
$295,318.00
25482-83
147,547.00
6,143.00
1712-84
18613-84
18881-84
20,018.97
18882-84
1,350.00
18883-84
18884-84
18885-84
18886-84
6,126.42
18887-84
18888-84
The issue for decision [2] is to what extent may petitioners, as limited partners, deduct their shares of any losses and interest claimed by coal mining partnerships. Resolution of this issue is generally dependent upon the following: (1) Whether the partnerships are entitled to deductions for royalties; (2) whether the partnerships are entitled to deductions for amounts paid to general partners; (3) whether the partnerships are entitled to deductions for travel expenses, legal, consulting and accounting fees; (4) whether the partnerships are entitled to deductions for amortization and depletion; and (5) whether the partnerships are entitled to various deductions for interest under section 163. [3]
*134 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulations of facts and exhibits are incorporated by reference. Petitioners James R. Leach and Carol S. Leach were residents of Oklahoma at the time their petition was filed. Petitioners Larry R. Killough, Mary S. Killough, Calvin M. Bracy, Melinda M. Bracy, Catherine Williams, Audrey Ann Aldridge, James H. Nettles, Betsy M. Nettles, William G. Campbell and Norma T. Campbell were residents of Arkansas at the time their petitions were filed. Petitioners Jesse L. Wofford and Mary R. Wofford were residents of Mississippi at the time their petitions were filed. Scranton Mineral Associates, Ltd. (hereinafter referred to as "SMA, Ltd.") was a limited partnership organized under the laws of the State of Arkansas. The general partner of SMA, Ltd., was, until December 30, 1976, Interglobal, Inc., an Arkansas corporation. As of December 30, 1976, the general partner of SMA, Ltd., was SMA, Inc. David R. Kane was president of SMA, Inc., which was part of a group of corporations controlled by Mr. Kane. James Associates, Ltd., was a limited partnership which was organized *135 in December 1976 under the laws of the State of Arkansas. As of December 31, 1976, the general partners of James Associates, Ltd., were William P. Rodgers and International Energy Consultants, Inc., an Arkansas corporation. In 1977, Mr. Kane forced Mr. Rodgers to withdraw from the partnership. Spadra Associates, Ltd., was a limited partnership which was organized in December 1976 under the laws of the State of Arkansas. As of December 31, 1976, the general partners of Spadra Associates, Ltd., were IEI Realty, Inc., and Interglobal, Inc. IEI Realty, Inc., and Interglobal, Inc., are part of a group of corporations controlled by Mr. Kane. Royale Properties was a general partnership which was organized in December 1976 under the laws of the State of Arkansas. Mr. Kane was the managing partner of Royale Properties. Titan Mining II, Ltd., was a limited partnership which was organized under the laws of the State of Arkansas. As of December 31, 1976, the general partners of Titan Mining II, Ltd., were Titan Mining II, Inc., and Robert M. Traylor, Jr. Titan Mining II, Inc., is part of a group of corporations controlled by Mr. Kane. All four partnerships - James Associates, Ltd. *136 , Spadra Associates, Ltd., Titan Mining II, Ltd., and Royale Properties (hereinafter sometimes referred to as "the partnerships") - were controlled directly or indirectly by David Kane or a group of corporations controlled by Mr. Kane. Beginning in December 1976, a group of individuals known as the "Selig group" contacted parties in Arkansas, including current or future partners of SMA, Ltd., James Associates, Ltd., Spadra Associates, Ltd., Titan Mining II, Ltd., and Royale Properties, with respect to either purchasing or entering into a joint venture for the development of portions of what is known as the Scranton coal field (hereinafter referred to as the "subject coal fields"). The interest of the Selig group with respect to such activities, however, was contingent upon their receipt of a satisfactory mining report from a specific engineering firm concerning the subject coal fields. The subject coal fields are located in west-central Arkansas near Scranton. These fields comprise a portion of what is known as the Lower Hartshorne coal seam. Much of the subject coal fields are covered by water. The subject coal fields consist of two large and odd-shaped contiguous tracts and *137 several smaller independent blocks. This geographical area lies over an east-west trending geological syncline (or dip) formed by folding and accentuated by a series of undefined faults. [4] The Lower Hartshorne coal seam intersects the ground surface both to the north and south of the subject coal fields. With respect to the subject coal fields, however, the coal seam lies several hundred feet beneath the surface. The subject coal fields contain numerous undefined faults which result in significant displacements of strata. The coal contained in the subject coal fields is of the semi-anthracite Hartshorne type. This coal is an uncommon variety possessing several unique physical and chemical characteristics which limit its general utility. It is not ordinarily interchangeable with other more common types of coal mined in the United States. At the beginning of December 1976, the subject coal fields were owned primarily by Arkansas Real Estate Company although several other individuals owned minor interests. On December 15, 1976, William P. Rodgers and *138 Interglobal, Inc., executed a document entitled "Commitment to Obtain Financing" whereby Interglobal, Inc., contemplated the formation of an Arkansas limited partnership that would acquire certain coal mining leases with respect to portions of the subject coal fields and lease them to a limited partnership which Rodgers contemplated forming. Pursuant to this agreement, Interglobal, Inc., agreed that its limited partnership would arrange financing for the Rodgers limited partnership from a bank or lending institution with respect to certain minimum royalty payments that the Rodgers partnership was required to make. The agreement also provided that if the Interglobal, Inc., limited partnership were unable to obtain the specified financing, then Interglobal, Inc., would provide the financing by accepting the partnership's notes. On December 15, 1976, IEI Realty, Inc., and Interglobal, Inc., executed a document entitled "Commitment to Obtain Financing" whereby Interglobal, Inc., contemplated the formation of an Arkansas limited partnership that would acquire certain coal mining leases with respect to portions of the subject coal fields and lease them to a limited partnership which *139 IEI Realty, Inc., contemplated forming. Pursuant to this agreement, Interglobal, Inc., agreed that its limited partnership would arrange financing for the IEI Realty, Inc., limited partnership from a bank or lending institution with respect to certain minimum royalty payments that the IEI Realty, Inc., partnership was required to make. The agreement also provided that if the Interglobal, Inc., limited partnership were unable to obtain the specified financing, then Interglobal, Inc., would provide the financing by accepting the partnership's notes. On December 15, 1976, Royale Properties and Interglobal, Inc., executed a document entitled "Commitment to Obtain Financing" whereby Interglobal, Inc., contemplated the formation of an Arkansas limited partnership that would acquire certain coal mining leases with respect to portions of the subject coal fields and lease them to Royale Properties. Pursuant to this agreement, Interglobal, Inc., agreed that its limited partnership would arrange financing for Royale Properties from a bank or lending institution with respect to certain minimum royalty payments that Royale Properties was required to make. The agreement also provided that *140 if the Interglobal, Inc., limited partnership were unable to obtain the specified financing, then Interglobal, Inc., would provide the financing by accepting the partnership's notes. On December 15, 1976, Titan Mining II, Ltd., and Interglobal, Inc., executed a document entitled "Commitment to Obtain Financing" whereby Interglobal, Inc., contemplated the formation of an Arkansas limited partnership that would acquire certain coal mining leases with respect to portions of the subject coal fields and lease them to Titan Mining II, Ltd. Pursuant to this agreement, Interglobal, Inc., agreed that its limited partnership would arrange financing for Titan Mining II, Ltd., from a bank or lending institution with respect to certain minimum royalty payments that Titan Mining II, Ltd., was required to make. The agreement also provided that if the Interglobal, Inc., limited partnership were unable to obtain the specified financing, then Interglobal, Inc., would provide the financing by accepting the partnership's notes. On December 30, 1976, Interglobal, Inc., assigned its rights under the Commitments to Obtain Financing to SMA, Ltd. Further, on the same date, William Rodgers and IEI, Realty, *141 Inc., assigned their rights under the Commitments to Obtain Financing to James Associates, Ltd., and Spadra Associates, Ltd., respectively. On December 31, 1976, Arkansas Real Estate Company and certain other tenants in common leased to SMA, Ltd., the mineral rights to coal in portions of the subject coal fields. Although the lease does not specifically describe the lands to be leased, it does afford the lessee the right to select six 1,400-acre tracts of real property out of lands described in the lease. According to the provisions of the lease, SMA, Ltd., was to pay a production royalty of $ .75 per ton for each ton of coal stripped, mined or removed from the property. The lease further provided that if the sale price of the coal removed from the property exceeded $21.42 per ton, then additional royalties with respect to the excess were due under the lease. The lease also provided that SMA, Ltd., was to pay advance royalties of $1,575,000 for each of the six tracts of leased land. With respect to the first 1,400-acre tract, $200,000 of the $1,575,000 advance royalty was to be paid in cash with the balance evidenced by a nonrecourse note bearing interest at 6 percent per year. *142 Principal and interest payments of $25,000 on the note were scheduled for December 31, 1977, 1978, 1979 and 1980. The lease also provided that, unless substantial and continuous mining operations had been initiated on the leased property within 5 years, or unless the lessee made additional annual payments on the nonrecourse notes, the notes would be callable and the lease could be terminated. Finally, the lease afforded the lessee the opportunity to institute such investigations as it deemed advisable to prove the existence of coal deposits on the subject property. If such investigations disclosed less than 4,000,000 tons of recoverable coal on each of the six tracts, then the lessor could select additional properties so that the total recoverable reserves on each tract would be at least 4,000,000 tons of coal. On December 31, 1976, six promissory notes were executed by SMA, Ltd., five in the amount of $1,508,333.33 and one in the amount of $1,375,000, all payable to Arkansas Real Estate Company. All of these notes were nonrecourse and contain specific repayment schedules. According to the provisions of these repayment schedules, almost $700,000 of each note was due upon the *143 expiration of the lease. On December 31, 1976, SMA, Ltd., also paid Arkansas Real Estate Company $533,333.35. On December 31, 1976, the same date on which Arkansas Real Estate Company leased certain real property to SMA, Ltd., it, in turn, subleased certain mineral rights with respect to portions of the property to James Associates, Ltd. (hereinafter this lease will be referred to as the "James AB lease" and the property subject to such sublease will be referred to as the "James AB property"). The sublease of the James AB property was for a 20-year period and specified the payment of the following annual minimum royalties by James Associates, Ltd., to SMA, Ltd., with respect to tracts A and B of the James AB property, payable without regard to the amount of coal actually mined during any year of the lease: Amount of Annual
Minimum Royalties
Date of Payments
James Tract A
James Tract B
December 31, 1976
$249,500
$748,500
December 31, 1977
249,500
748,500
December 31, 1978 through 1995
200,000
600,000
Further, the James AB lease provided for earned or production royalties of at least 79.75 cents per ton of coal removed from the land. According *144 to the terms of the James AB lease, the annual minimum royalties were to be recouped from the earned royalties at the rate of 50 cents per ton of coal removed from the James AB property. The James AB lease also provided for lease bonuses on tracts A and B in the amounts of $600,000 and $1,800,000, respectively. According to the terms of the James AB lease, the liability of James Associates, Ltd., for the lease bonus payments was evidenced by nonrecourse promissory notes bearing 6 percent interest. Further, the James AB lease afforded the lessee the opportunity to institute such investigations as it deemed advisable in order to establish that the James tracts contained at least 4,000,000 tons of recoverable coal. If such inspection disclosed a lesser amount, additional properties could be substituted to achieve total recoverable coal reserves in excess of 4,000,000 tons. The James AB lease also provided that, if the lessee failed to perform or observe any of its obligations under the lease, the lessor had the right to foreclose on the lease upon 30 days notice. Finally, although the James AB lease sets forth separate amounts for annual minimum royalties and lease bonuses for Tract *145 A and Tract B, neither the lease nor the designation agreement identify a Tract A which is separate and distinct from Tract B. On December 31, 1976, SMA, Ltd., leased to James Associates, Ltd., an undivided one-fourth interest as tenant in common in all coal in certain described real property (hereinafter this lease will be referred to as the "James Hixson lease" and the property described in such lease shall be referred to as the "James Hixson property"). The term of the lease was 20 years. The James Hixson lease also specified payment of the following annual minimum royalties by James Associates, Ltd., to SMA, Ltd., which were payable without regard to the amount of coal actually mined during any year of the lease: Date of Payment
Amount
December 31, 1976
$9,300
December 31, 1977
9,300
December 31, 1978 through 1995
7,500
The James Hixson lease also provided for earned royalties of $1.75 per ton of coal mined and sold from the property. According to the terms of the James Hixson lease, the annual minimum royalties were to be recouped from the earned royalties at the rate of $1.00 per ton of coal mined and sold. On December 31, 1976, James Associates, *146 Ltd., executed a nonrecourse promissory note payable to SMA, Ltd., with respect to the balance of the annual minimum royalty due on December 31, 1976. James Associates Ltd., paid SMA, Ltd., $4,350 with respect to a portion of the annual minimum royalty associated with the James Hixson lease. On December 31, 1976, Titan Mining, Ltd. 75-1, a partnership also controlled by Mr. Kane, leased to James Associates, Ltd., an undivided one-half interest in all coal located on certain described real property (hereinafter this lease will be referred to as the "James Tucker-Sneed lease" and the property described in such lease shall be referred to as the "James Tucker-Sneed property"). The term of this lease was from December 31, 1976, to September 6, 1986. The James Tucker-Sneed lease also specified the payment of the following annual minimum royalties by James Associates, Ltd., to Titan Mining, Ltd. 75-1, which were payable without regard to the amount of coal actually mined during any year of the lease: Date of Payment
Amount
December 31, 1976
$10,000
December 31, 1977 through 1985
7,500
On December 31, 1976, James Associates, Ltd., paid Titan Mining, Ltd. 75-1, $10,000 *147 by check bearing the notation, "minimum royalty - Tucker/Sneed lease." On December 31, 1976, Titan Mining, Ltd. 75-1, leased to James Associates, Ltd., an undivided one-half interest in all coal located on certain described real property (hereinafter this lease will be referred to as the "James Rowbotham lease" and the property described in such lease will be referred to as the "James Rowbotham property"). The term of this lease was from December 31, 1976, to July 19, 1986. The James Rowbotham lease also specified the payment of following annual minimum royalties by James Associates, Ltd., to Titan Mining, Ltd. 75-1, which were payable without regard to the amount of coal actually mined during any year of the lease: Date of Payment
Amount
December 31, 1976
$7,500
December 31, 1977 through 1985
5,000
On December 31, 1976, James Associates, Ltd., wrote two checks payable to SMA, Ltd., in the amounts of $249,500 and $110,000, bearing the following notations: "minimum advance royalty payment on Tract A" and "minimum royalty payment on Tract B." On December 31, 1976, James Associates, Ltd., executed a promissory note in the amount of $638,500 payable to SMA, *148 Ltd., which provided for simple interest at 6 percent per year and for payment in four annual installments of $222,575.67 each, beginning December 31, 1981. The note was nonrecourse and also provided that it was to be secured by a collateral assignment and a mortgage. On December 31, 1976, James Associates, Ltd., executed a promissory note in the amount of $600,000 payable to SMA, Ltd., with respect to the lease bonus provisions of the James AB lease.The note was nonrecourse, bore interest at 6 percent per year, and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for five annual $6,000 payments beginning April 1, 1977, which were to be followed by 15 annual $71,777.66 payments beginning December 31, 1982. On December 31, 1976, James Associates, Ltd., executed a promissory note in the amount of $1,800,000 payable to SMA, Ltd., with respect to the lease bonus provisions of the James AB lease. This note was also nonrecourse, bore interest at 6 percent per year, and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for five annual $18,000 payments beginning April 1, 1977, followed *149 by 15 annual $215,332.98 payments beginning December 31, 1982. On December 31, 1976, James Associates, Ltd., wrote a check payable to SMA, Ltd., in the amount of $4,350, bearing the notation, "minimum royalty - Hixson lease." On December 31, 1976, James Associates, Ltd., executed a promissory note in the amount of $4,950 payable to SMA, Ltd., with respect to sums associated with the James AB lease and James Hixson lease. The note was nonrecourse, bore interest at 6 percent per year and was to be secured by a collateral assignment and a mortgage. On December 31, 1976, James Associates, Ltd., executed two documents entitled "Collateral Assignment" in favor of SMA, Ltd., with respect to the rights of James Associates, Ltd., under the James Tucker-Sneed, James Rowbotham, James Hixson and James AB leases. Pursuant to these documents, James Associates, Ltd., acknowledged its indebtedness to SMA, Ltd.; and, in order to provide security for its obligations under the leases and nonrecourse promissory notes, as "well as any future indebtedness," it assigned all of its rights under the aforementioned leases to SMA, Ltd. Further, according to the provisions of these agreements, the assignments *150 were to expire on December 30, 1996, the date by which the rights of James Associates, Ltd., under the leases, terminated, instead of being keyed to satisfaction of the underlying indebtedness. On December 31, 1976, James Associates, Ltd., executed two mortgages in favor of SMA, Ltd. These mortgages provided that, in the event of default of payment of any of the installments due under the four promissory notes executed in favor of SMA, Ltd., by James Associates, Ltd., on December 31, 1976, SMA, Ltd., could accelerate the balance of remaining obligations and immediately foreclose on the underlying properties. On December 31, 1976, the same date on which Arkansas Real Estate Company leased certain real property to SMA, Ltd., it, in turn, subleased certain mineral rights with respect to portions of the property to Spadra Associates, Ltd. (hereinafter this lease will be referred to as the "Spadra AB lease" and the property subject to such sublease will be referred to as the "Spadra AB property"). The sublease of the Spadra AB property was for a 20-year period and specified the payment of the following annual minimum royalties by Spadra Associates, Ltd., to SMA, Ltd., with respect *151 to tracts A and B of the Spadra AB property, without regard to the amount of coal actually mined during any year of the lease: Amount of Annual
Minimum Royalty
Date of Payments
Spadra Tract A
Spadra Tract B
December 31, 1976
$294,500
$882,750
December 31, 1977
294,500
882,750
December 31, 1978 through 1995
235,950
707,850
Further, the Spadra AB lease provided for production royalties of at least 79.75 cents per ton of coal removed from the land. According to the terms of the Spadra AB lease, the annual minimum royalties were to be recouped from the production royalties at the rate of 50 cents per ton of coal removed from the Spadra AB property. The Spadra AB lease also provided for lease bonuses on tracts A and B in the amounts of $700,000 and $2,100,000, respectively. According to the terms of the Spadra AB lease, the liability of Spadra Associates, Ltd., for the lease bonus payments was to be evidenced by nonrecourse promissory notes bearing 6 percent interest. Further, the Spadra AB lease afforded the lessee the opportunity to institute such investigations as it deemed advisable in order to establish that the Spadra tracts contained *152 at least 4,000,000 tons of recoverable coal. If such inspection disclosed a lesser amount, additional properties could be substituted to achieve total recoverable coal reserves in excess of 4,000,000 tons. The Spadra AB lease also provided that, if the lessee failed to perform or observe any of its obligations under the lease, the lessor had the right to foreclose on the lease upon 30 days notice. Further, although the Spadra AB lease sets forth separate amounts for annual minimum royalties and lease bonuses for Tract A and Tract B, neither the lease nor the designation agreement identify a Tract A which is separate and distinct from Tract B. On December 31, 1976, SMA, Ltd., leased to Spadra Associates, Ltd., an undivided one-fourth interest as tenant in common in all coal in certain described real property (hereinafter this lease will be referred to as the "Spadra Hixson lease" and the property described in such lease shall be referred to as the "Spadra Hixson property"). The term of the lease was 20 years. The Spadra Hixson lease also specified the following payments of annual minimum royalties by Spadra Associates, Ltd., to SMA, Ltd., which were payable without regard to the *153 amount of coal actually mined during any year of the lease: Date of Payment
Amount
December 31, 1976
$9,300
December 31, 1977
9,300
December 31, 1978 through 1995
7,500
The Spadra Hixson lease also provided for earned royalties of $1.75 per ton of coal mined and sold from the property. According to the provisions of the Spadra Hixson lease, the annual minimum royalties were to be recouped from the earned royalties at the rate of $1.00 per ton of coal mined and sold. On December 31, 1976, Titan Mining, Ltd. 75-1, leased to Spadra Associates, Ltd., an undivided one-half interest in all coal located on certain described real property (hereinafter this lease will be referred to as the "Spadra Tucker-Sneed lease" and the property described in such lease shall be referred to as the "Spadra Tucker-Sneed property"). The term of this lease was from December 31, 1976, to September 6, 1986. The Spadra Tucker-Sneed lease also specified the the following payments of annual minimum royalties by Spadra Associates, Ltd., to Titan Mining. Ltd. 75-1, which were payable without regard to the amount of coal actually mined during any year of the lease: Date of Payment
Amount
December 31, 1976
$10,000
December 31, 1977 through 1985
7,500
*154 On December 31, 1976, Titan Mining, Ltd. 75-1, leased to Spadra Associates, Ltd., an undivided one-half interest in all coal located on certain described real property (hereinafter this lease will be referred to as the "Spadra Rowbotham lease" and the property described in such lease will be referred to as the "Spadra Rowbotham property"). The term of this lease was from December 31, 1976, to July 19, 1986. The Spadra Rowbotham lease also specified payments of the following annual minimum royalties by Spadra Associates, Ltd., to Titan Mining, Ltd. 75-1, which were payable without regard to the amount of coal actually mined during any year of the lease: Date of Payment
Amount
December 31, 1976
$7,500
December 31, 1977 through 1985
5,000
On December 31, 1976, Spadra Associates, Ltd., wrote two checks payable to SMA, Ltd., in the amounts of $294,250 and $80,000, bearing the following notations, "Minimum Royalty - Tract A" and "Minimum Royalty - Tract B." On December 31, 1976, Spadra Associates, Ltd., executed a promissory note in the amount of $802,750 payable to SMA, Ltd., which provided for simple interest at 6 percent per year and for payment in four annual *155 installments of $279,831.82 each, beginning December 31, 1981. The note was nonrecourse and also provided that it was to be secured by a collateral assignment and by a mortgage. On December 31, 1976, Spadra Associates, Ltd., executed a promissory note in the amount of $2,100,000 payable to SMA, Ltd., with respect to the lease bonus provisions of the Spadra AB lease. The note was nonrecourse, bore interest at 6 percent per year, and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for five annual $10,500 payments beginning March 31, 1977, which were to be followed by 15 annual $254,721.80 payments beginning December 31, 1982. On December 31, 1976, Spadra Associates, Ltd., executed a promissory note in the amount of $700,000 payable to SMA, Ltd., with respect to the lease bonus provisions of the Spadra AB lease. This note was also nonrecourse, bore interest at 6 percent per year, and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for five annual $3,500 payments beginning March 1, 1977, followed by 15 annual $85,907.26 payments beginning December 31, 1982. *156 On December 31, 1976, Spadra Associates, Ltd., wrote a check payable to SMA, Ltd., in the amount of $4,350, bearing the notation, "Minimum Royalty - Hixson lease." On December 31, 1976, Spadra Associates, Ltd., executed a promissory note in the amount of $4,950 payable to SMA, Ltd., with respect to sums associated with the Spadra Hixson lease. The note was nonrecourse, bore interest at 6 percent per year and was to be secured by a collateral assignment and a mortgage. On December 31, 1976, Spadra Associates, Ltd., paid Titan Mining, Ltd. 75-1, by check, the annual minimum royalties specified in the Spadra Tucker-Sneed and Spadra Rowbotham leases. On December 31, 1976, Spadra Associates, Ltd., executed three documents entitled "Collateral Assignment" in favor of SMA, Ltd., with respect to the rights of Spadra Associates, Ltd., under the Spadra Tucker-Sneed, Spadra Rowbotham, Spadra Hixson and Spadra AB leases. Pursuant to these documents, Spadra Associates, Ltd., acknowledged its indebtedness to SMA, Ltd.; and, in order to provide security for its obligations under the leases and nonrecourse promissory notes, as "well as any future indebtedness," it assigned all of its rights *157 under the aforementioned leases to SMA, Ltd. Further, instead of being keyed to satisfaction of the underlying indebtedness, the assignments, according to the provisions of these agreements, were to expire on December 30, 1996, the date by which the rights of Spadra Associates, Ltd., terminated under the leases. On December 31, 1976, Spadra Associates, Ltd., executed three mortgages in favor of SMA, Ltd. These mortgages provided that, in the event of default of payment of any of the installments due under the four promissory notes executed in favor of SMA, Ltd., by Spadra Associates, Ltd., on December 31, 1976, SMA, Ltd., could accelerate the balance of remaining obligations and immediately foreclose on the underlying properties. On December 31, 1976, the same date on which Arkansas Real Estate Company leased certain real property to SMA, Ltd., it, in turn, subleased certain mineral rights with respect to portions of the property to Royale Properties (hereinafter this lease will be referred to as the "Royale AB lease" and the property subject to such sublease will be referred to as the "Royale AB property"). The sublease of the Royale AB property was for a 20-year period. The *158 sublease also specified the following payments of annual minimum royalties by Royale Properties to SMA, Ltd., with respect to tracts A and B of the Royale AB property, without regard to the amount of coal actually mined during any year of the lease, beginning on December 31, 1976 through 1995: Tract A
Tract B
$125,000
$375,000
Further, the Royale AB lease provided for production royalties of at least 79.75 cents per ton of coal removed from the land. According to the terms of the Royale AB lease, the annual minimum royalties were to be recouped from the production royalties at the rate of 35 cents per ton of coal removed from the Royale AB property. The Royale AB lease also provided for lease bonuses on tracts A and B in the amounts of $250,000 and $750,000, respectively. According to the terms of the Royale AB lease, the liability of Royale Properties for the lease bonus payments was to be evidenced by nonrecourse promissory notes bearing 6 percent interest. Further, the Royale AB lease afforded the lessee the opportunity to institute such investigations as it deemed advisable in order to establish that the Royale tracts contained at least 4,000,000 tons of *159 recoverable coal. If such inspection disclosed a lesser amount, additional properties could be substituted to achieve total recoverable coal reserves in excess of 4,000,000 tons. The Royale AB lease also provided that, if the lessee failed to perform or observe any of its obligations under the lease, the lessor had the right to foreclose on the lease upon 30 days notice. Finally, although the Royale AB lease sets forth separate amounts for annual minimum royalties and lease bonuses for Tract A and Tract B, neither the lease nor the designation agreement identify a Tract A which is separate and distinct from Tract B. On December 31, 1976, Royale Properties wrote two checks payable to SMA, Ltd., in the amounts of $5,000 and 75,000. On December 31, 1976, Royale Properties executed a promissory note in the amount of $425,000 payable to SMA, Ltd., which provided for simple interest at 6 percent per year and for payment in four annual installments of $148,151.38 each, beginning December 31, 1981. The note was nonrecourse and also provided that it was to be secured by a collateral assignment and a mortgage. On December 31, 1976, Royale Properties executed a promissory note in the *160 amount of $750,000 payable to SMA, Ltd., with respect to the lease bonus provisions of the Royale AB lease. The note was nonrecourse, bore interest at 6 percent per year, and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual $22,500 payments beginning December 31, 1977, which were to be followed by five annual $50,000 payments beginning December 31, 1981, with the balance due on December 31, 1986. On December 31, 1976, Royale Properties executed a promissory note in the amount of $250,000 payable to SMA, Ltd., with respect to the lease bonus provisions of the Royale AB lease. This note was also nonrecourse, bore interest at 6 percent per year, and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual $7,500 payments beginning December 31, 1977, followed by five annual $25,000 payments beginning December 31, 1981, with the balance due December 31, 1986. On December 31, 1976, Royale Properties executed a document entitled "Collateral Assignment" in favor of SMA, Ltd., with respect to the rights of Royale Properties under the Royale *161 AB lease. Pursuant to this document, Royale Properties acknowledged its indebtedness to SMA, Ltd.; and, in order to provide security for its obligations under the leases and nonrecourse promissory notes, as "well as any future indebtedness," it assigned all of its rights under the aforementioned leases to SMA, Ltd. Further, instead of being keyed to satisfaction of the underlying indebtedness, the assignments, according to the provisions of these agreements, were to expire on December 30, 1996, the date by which the rights of Royale Properties terminated under the leases. On December 3u, 1976, Royale Properties executed a mortgage in favor of SMA, Ltd. This mortgage provided that, in the event of default of payment of any of the installments due under the three promissory notes executed in favor of SMA, Ltd., by Royale Properties on December 31, 1976, SMA, Ltd., could accelerate the balance of remaining obligations and immediately foreclose on the underlying properties. On December 31, 1976, the same date on which Arkansas Real Estate Company leased certain real property to SMA, Ltd., the latter subleased certain mineral rights with respect to portions of the property to Titan *162 Mining II, Ltd. (hereinafter this lease will be referred to as the "Titan AB lease" and the property subject to such sublease will be referred to as the "Titan AB property"). The sublease of the Titan AB property was for a 20-year period and specified the the following payments of annual minimum royalties by Titan Mining II, Ltd., to SMA, Ltd., with respect to tracts A and B of the Titan AB property, payable without regard to the amount of coal actually mined during any year of the lease: Amount of Annual
Minimum Royalty
Date of Payments
Titan Tract A
Titan Tract B
December 31, 1976
$100,000
$300,000
December 31, 1977
100,000
30,000
December 31, 1978 through 1995
83,750
251,250
Further, the Titan AB lease provided for production royalties of at least 79.75 cents per ton of coal removed from the land. According to the terms of the Titan AB lease, the annual minimum royalties were to be recouped from the production royalties at the rate of 50 cents per ton of coal removed from the Titan AB property. The Titan AB lease also provided for lease bonuses on tracts A and B in the amounts of $240,000 and $720,000, respectively. According to the *163 terms of the Titan AB lease, the liability of Titan Mining II, Ltd., for the lease bonus payments was to be evidenced by nonrecourse promissory notes bearing 6 percent interest. Further, the Titan AB lease afforded the lessee the opportunity to institute such investigations as it deemed advisable in order to establish that the Titan tracts contained at least 4,000,000 tons of recoverable coal. If such inspection disclosed a lesser amount, additional properties could be substituted to achieve total recoverable coal reserves in excess of $4,000,000 tons. The Titan AB lease also provided that, if the lessee failed to perform or observe any of its obligations under the lease, the lessor had the right to foreclose on the lease upon 30 days notice. Finally, although the Titan AB lease sets forth separate amounts for annual minimum royalties and lease bonuses for Tract A and Tract B, neither the Titan AB lease nor the designation agreement identify a Tract A which is separate and distinct from Tract B. On December 31, 1976, Titan Mining II, Ltd., wrote a check payable to SMA, Ltd., in the amount of $50,000, bearing the notation, "Mineral Royalty Tract A." On December 31, 1976, Titan *164 Mining II, Ltd., executed a promissory note in the amount of $200,000 payable to SMA, Ltd. The note provided for simply interest at 6 percent per year and provided for payment in four annual installments of $69,718.28 each, beginning December 31, 1981. The note was nonrecourse and also provided that it was to be secured by a collateral assignment and a mortgage. On December 31, 1976, Titan Mining II, Ltd., executed a promissory note in the amount of $150,000 payable to SMA, Ltd. The note bore interest at 6 percent per year and was to be paid by September 1, 1977. On December 31, 1976, Titan Mining II, Ltd., executed a promissory note in the amount of $240,000 payable to SMA, Ltd., with respect to the lease bonus provisions of the Titan AB lease. This note was also nonrecourse, bore interest at 6 percent per year, and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual $14,400 payments beginning December 31, 1977, followed by varying annual payments beginning December 31, 1981, with the balance due on December 31, 1986. On December 31, 1976, Titan Mining II, Ltd., executed promissory notes in the amounts *165 of $720,000 and $240,000 payable to SMA, Ltd. These notes were nonrecourse, bore interest at 6 percent and were to be secured by collateral assignments and mortgages. On December 31, 1976, Titan Mining II, Ltd., executed promissory notes payable to SMA, Ltd., exceeding Titan's obligations under the Titan AB lease by the amount of $240,000. On December 31, 1976, Titan Mining II, Ltd., executed a document entitled "Collateral Assignment" in favor of SMA, Ltd., with respect to the rights of Titan Mining II, Ltd., under the Titan AB lease. Pursuant to this document, Titan Mining II, Ltd., acknowledged its indebtedness to SMA, Ltd.; and, in order to provide security for its obligations under the leases and nonrecourse promissory notes, as "well as any future indebtedness," it assigned all of its rights under the aforementioned leases to SMA, Ltd. Further, instead of being keyed to satisfaction of the underlying indebtedness, the assignments were, according to the provisions of these agreements, to expire on December 30, 1996, the date by which the rights of Titan Mining II, Ltd., under the leases terminated. In early 1977, the Selig group obtained its coal mining study including *166 an opinion on the viability of coal mining in the subject coal fields. The study was largely based upon geological circulars prepared by Mr. Boyd Haley when he was with the U.S. Geological Survey and upon an examination of the property. It concluded that any additional testing needed to confirm a reasonably accurate estimate of recoverable reserves on the subject properties would be discouraging. The report noted numerous problems including faults, streams, the proximity of the Arkansas River, and covered the depth and average thickness of the seam. The report also projected relatively expensive mining costs of $21 per ton of coal. Based upon this report, the Selig group did not acquire any interest in the subject coal fields. This unfavorable report was, in turn, supplied to the parties in Arkansas which included SMA, Ltd., James Associates, Ltd., Spadra Associates, Ltd., Titan Mining II, Ltd., and Royale Properties. On December 31, 1977, SMA, Ltd., failed to make the payments to Arkansas Real Estate Company as required by the lease and nonrecourse promissory notes dated December 31, 1976. Despite the failure of SMA, Ltd., to make such payments, the lessor agreed to defer *167 the obligation to make the payments required under the note and lease. On December 31, 1977, James Associates, Ltd., executed a promissory note payable to SMA, Ltd., in the amount of $748,500 with respect to the annual minimum royalties due on the James Tract B. The note was nonrecourse, bore interest at 6 percent, and was secured by a collateral assignment and a mortgage. On December 31, 1977, James Associates, Ltd., executed a check to Scranton Minerals in the amount of $258,800 which bears the notation, "min royalty payment for 1977." On December 31, 1977, James Associates, Ltd., wrote checks payable to Titan I in the amounts of $5,000 and $7,500 which bear the notations, "min royalty 1977 Tucker Sneed" and "min royalty on Rowbotham." On December 31, 1977, Spadra Associates, Ltd., executed a promissory note payable to SMA, Ltd., in the amount of $882,750 with respect to the annual minimum royalties associated with the Spadra Tract B. The note was nonrecourse, bore interest at 6 percent per year and was secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual payments of $307,719.14 each, beginning December 31, 1982. *168 On December 31, 1977, Spadra Associates, Ltd., paid SMA, Ltd., $303,550 by check bearing the notation, "1977 minimum royalty payment." Spadra Associates, Ltd., Paid Titan Mining, Ltd. 75-1, by check the amounts specified in the Spadra Rowbothan lease and Spadra Tucker-Sneed lease as annual minimum royalties due on December 31, 1977. On December 31, 1977, Royale Properties wrote a check in the amount of $75,000 to Scranton Minerals, bearing the notation, "1977 minimum royalty payment." On December 31, 1977, Royale Properties executed a promissory note payable to SMA, Ltd., in the amount of $425,000. The note was nonrecourse, bore interest at 6 percent per year and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual payments in the amount of $148,151.38 each, beginning December 31, 1982. On December 31, 1977, Titan Mining II, Ltd., wrote a check payable to Scranton Minerals in the amount of $200,000, bearing the notation, "1977 Minimum royalty payment." On December 31, 1977, Titan Mining II, Ltd., executed a promissory note payable to SMA, Ltd., in the amount of $200,000.The note was nonrecourse, bore *169 interest at 6 percent per year and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual payments in the amount of $69,718.28 each, beginning December 31, 1982. On December 31, 1977, Titan Mining II, Ltd., executed an additional promissory note payable to SMA, Ltd., in the amount of $200,000. The provisions of this note were identical to another $200,000 note executed on this date. On December 31, 1977, Titan Mining II, Ltd., executed promissory notes payable to SMA, Ltd., in an amount $200,000 in excess of Titan's obligations under the Titan AB lease. On December 31, 1978, SMA, Ltd., failed to make the required payments due Arkansas Real Estate Company under the lease and nonrecourse promissory notes. Despite this failure to make the required payments, the lessor agreed to defer the obligation to make the payments required under the lease and notes. On December 30, 1978, James Associates, Ltd., executed a promissory note payable to SMA, Ltd., in the amount of $600,000 with respect to the minimum annual royalty due on the James Tract B. The note was nonrecourse, bore interest at 6 percent and was to *170 be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual installments of $209,154,90 each, beginning December 31, 1983. James Associates, Ltd., did not make all of the payments due SMA, Ltd., on December 31, 1978, with respect to annual minimum royalties associated with the James AB and James Hixson leases. James Associates, Ltd., also failed to make similar payments due Titan Mining II, Ltd., on December 31, 1978, with respect to the James Rowbotham and James Tucker-Sneed leases. On December 30, 1978, Spadra Associates, Ltd., executed a promissory note payable to SMA, Ltd., in the amount of $707,850 with respect to the annual minimum royalties associated with the Spadra Tract B. The note was nonrecourse, bore interest at 6 percent and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual installments of $246,750.49 each, beginning December 31, 1983. Spadra Associates, Ltd., did not make all of the payments to Titan Mining, Ltd. 75-1, with respect to the annual minimum royalties due on December 31, 1978, associated with the Spadra Rowbotham *171 and Spadra Tucker-Sneed leases. On December 30, 1978, Royale Properties executed a promissory note payable to SMA, Ltd., in the amount of $275,000. The note bore interest at the rate of 6 percent per year and was to be repaid on December 31, 1980. On December 30, 1978, Royale Properties executed a promissory note payable to SMA, Ltd., in the amount of $225,000. The note was nonrecourse, bore interest at 6 percent per year and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual payments of $78,433.09 each, beginning December 31, 1983. On December 30, 1978, Titan Mining II, Ltd., executed a promissory note payable to SMA, Ltd., in the amount of $135,000. The note was nonrecourse, bore interest at 6 percent per year and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual installments in the amount of $47,059.85 each, beginning December 31, 1983. On December 31, 1979, SMA, Ltd., failed to make the required payments due Arkansas Real Estate Company under the lease and promissory notes. Despite this failure to make the required *172 payments, the lessor agreed to defer the obligation to make the required payments. On December 31, 1979, James Associates, Ltd., executed a promissory note payable to SMA, Ltd., in the amount of $600,000 with respect to the annual minimum royalties due on the James Tract B. The note was nonrecourse, bore interest at 6 percent and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual installments in the amount of $209,154.90 each, beginning December 31, 1984. James Associates, Ltd., did not pay all of the amounts due Titan Mining, Ltd. 75-1, on December 31, 1979, with respect to the minimum annual royalty payments associated with the James Rowbotham and James Tucker-Sneed leases. James Associates, Ltd., did not pay all of the amounts due SMA, Ltd., on December 31, 1979, with respect to the minimum annual royalty payments associated with the James AB and James Hixson leases. On December 31, 1979, Royale Properties executed a promissory note payable to SMA, Ltd., in the amount of $275,000. The note bore interest at 6 percent per year and was payable on December 31, 1980. On December 31, 1979, Royale Properties *173 executed a promissory note payable to SMA, Ltd., in the amount of $225,000. The note was nonrecourse, bore interest at 6 percent per year and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual payments of $78,433.09 each, beginning December 31, 1984. On December 31, 1980, James Associates, Ltd., executed a promissory note payable to SMA, Ltd., in the amount of $600,000 with respect to the annual minimum royalties due on the James Tract B. The note was nonrecourse, bore interest at 6 percent and was to be secured by a collateral assignment and a mortgage. The payment schedule accompanying the note called for four annual installments in the amount of $209,154.90 each, beginning December 31, 1985. On December 31, 1980, James Associates, Ltd., executed a promissory note payable to SMA, Ltd., in the amount of $200,000 with respect to the annual minimum royalties due on the James Tract A. The note bore interest at 9.75 percent per year and was payable on or before March 1, 1981. James Associates, Ltd., did not pay Titan Mining, Ltd. 75-1, any amount due on December 31, 1980, with respect to the annual minimum *174 royalties associated with the James Rowbotham and James Tucker-Sneed leases. On December 31, 1980, Royale Properties executed a promissory note payable to SMA, Ltd., in the amount of $500,000. The note provided for interest at 9.75 percent per year and was payable on March 1, 1981. On December 31, 1980, Royale Properties executed a promissory note payable to SMA, Ltd., in the amount of $550,000. The note provided for interest at 9.75 percent per year and was payable March 1, 1981. On December 31, 1980, Royale Properties executed promissory notes payable to SMA, Ltd., in an amount of $550,000 in excess of its obligations under the Royale AB lease. No coal was ever mined or sold from the James AB, Spadra AB, Titan AB or Royale AB properties by or on behalf of the partnerships during the taxable years in issue. Under the James AB, Spadra AB, Titan AB and Royale AB leases, the annual minimum royalties, provided for (and payable to SMA, Ltd.), averaged approximately $375 per acre for the first two years of the leases and slightly less for years three through 20 of the leases. Comparable mineral leases in the area of the Scranton coal field generally required annual minimum *175 royalties of between $1 and $2 per acre per year. Several comparable mineral leases do not require any annual minimum royalties while the comparable mineral lease with the greatest minimum annual royalty was $12.50 per year per acre. Coal mining is a competitive business. In arm's-length transactions, there is a tendency for royalties in a limited geographic area to fall within a narrow range. The James AB, Spadra AB, Titan AB and Royale AB leases all contain provisions permitting the lessee to conduct geological studies on the subject properties to establish the amount and minability of the coal. Further, these leases provide that each 1,400-acre parcel thereof should contain at least 4,000,000 tons of recoverable coal; and, if it is determined not to contain at least such an amount, then additional land could be substituted to achieve the threshold of 4,000,000 tons of recoverable coal. Despite the immense importance of the amount and minability of the coal to the financial success of the partnerships, none of the partnerships caused any drilling or exploratory work to be performed on the subject coal fields in order to determine the amount or minability of the coal. James *176 Associates, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable period beginning December 30, 1976, and ending December 31, 1976, on the accrual method of accounting. It reported no gross receipts or sales and claimed the following deductions: $9,000 for salary and interest payments to partners; $15,283 for legal and accounting fees; $1,024,800 for minimum royalties and $39 for miscellaneous expenses. It, therefore, reported an ordinary loss of $1,049,122. Further, on its closing balance sheet, it reported no cash or other liquid assets and the vast majority of its nondepletable assets consisted of notes receivable from its limited partners. James Associates, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1977 on the accrual method of accounting. It reported gross sales of $287,841, cost of goods sold of $236,986, for a gross profit of $50,855 with respect to mining operations on the James Tucker-Sneed and James Rowbotham properties. It also reported $65,754 of interest income and claimed the following deductions: $183,671 for interest; $6,638 for legal and accounting fees; $3,000 for payments to partners and $1,039,008 *177 for royalties. It claimed no deduction for salaries or wages. It reported an ordinary loss of $1,131,245. Further, on its closing balance sheet, it reported cash of $1,242, no other liquid assets and the vast majority of its nondepletable assets consisted of notes receivable from its limited partners. James Associates, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1978 on the accrual method of accounting. It reported gross sales of $264,829, cost of goods sold of $249,092, for a gross profit of $15,737 with respect to mining operations on the James Tucker-Sneed and James Rowbotham properties. It also reported $38,552 of interest income. It claimed the following deductions: $173,492 for interest; $5,909 for legal and accounting fees and $825,869 for royalties. It reported an ordinary loss of $951,091. Further, on its closing balance sheet, it reported $588 of cash, no other liquid assets and the vast majority of its nondepletable assets consisted of notes receivable from its limited partners. James Associates, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1979 on the accrual method of accounting. It reported *178 gross receipts of $43,344 and no cost of goods sold, for a gross profit of $43,344. It also reported $17,151 of interest income. It claimed the following deductions: $317,220 for interest; $4,982 for accounting fees; royalties of $812,500 and $1,018 for miscellaneous expenses. It claimed no deductions for salaries or wages. It reported an ordinary loss of $1,110,936. Further, on its closing balance sheet, it reported $1,405 of cash, no other liquid assets and the vast majority of its nondepletable assets were identified as "lease bonus payments." James Associates, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1980 on the accrual method of accounting. It reported no gross sales but interest income in the amount of $5,939. It also claimed the following deductions: $299,220 for interest; accounting fees of $4,981, travel expenses of $3,523 and royalties of $812,500. It claimed no deductions for salaries or wages. It reported an ordinary loss of $1,115,238. Further, on its closing balance sheet, it reported $23 of cash, no other liquid assets and the vast majority of its nondepletable assets were identified as "lease bonus payments." Spadra *179 Associates, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable period beginning December 30, 1976, and ending December 31, 1976, on the accrual method of accounting. It reported no gross receipts or sales and claimed the following deductions: $15,033 for legal and accounting fees; $8,000 for consulting fees; and $1,204,050 for minimum royalties. It reported an ordinary loss of $1,227,083. Further, on its closing balance sheet, it reported that it had no cash or other liquid assets and the vast majority of its nondepletable assets consisted of notes receivable from its limited partners. Spadra Associates, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1977 on the accrual method of accounting. It reported gross sales of $287,841 and cost of goods sold of $236,985, for a gross profit of $50,856 with respect to mining operations on the Spadra Tucker-Sneed and Spadra Rowbotham properties. It also reported $75,058 of interest income. It claimed the following deductions: $218,655 for interest; $20,000 for payments to partners; legal and accounting fees of $7,012; consulting fees of $8,000; and $1,218,008 for royalties. It claimed *180 no deductions for salaries or wages. It reported an ordinary loss in the amount of $1,362,386. Further, on its closing balance sheet, it reported $83,397 of cash, no other liquid assets and the vast majority of its nondepletable assets consisted of notes receivable from limited partners. Spadra Associates, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1978 on the accrual method of accounting. It reported gross receipts of $264,830 and cost of goods sold of $243,694, for a gross profit of $21,136. It also reported $47,390 of interest income. It claimed the following deductions: interest of $271,589; $7,500 for payments to partners; legal and accounting fees of $4,086; consulting fees of $8,000 and royalties of $969,669. It claimed no deductions for salaries or wages. It reported an ordinary loss of $1,192,419. Further, on its closing balance sheet, it reported that it had $1,033 of cash, no other liquid assets and the vast majority of its nondepletable assets consisted of notes receivable from its limited partners. Spadra Associates, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1979 on the accrual method *181 of accounting. It reported gross sales of $43,344 and no cost of goods sold. It also reported $2,496 of interest income and claimed the following deductions: $312,000 for interest; accounting fees of $3,563; legal fees of $1,699; royalties of $956,300 and miscellaneous expenses of $467. It claimed no deductions for salaries or wages. It reported an ordinary loss in the amount of $1,263,911. Further, on its closing balance sheet, it reported cash of $1,169 and no other liquid assets. Spadra Associates, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1980 on the accrual method of accounting. No gross sales were reported on this return, although $2,627 of interest income was reported. It claimed the following deductions: $354,072 for interest; $3,989 for accounting fees and royalties of $956,300. It claimed no deductions for salaries or wages. It reported an ordinary loss of $1,314,248. Further, on its closing balance sheet, it reported $314 of cash and no other liquid assets. Royale Properties filed a Form 1065, U.S. Partnership Return of Income, for the taxable period begining December 30, 1976, and ending December 31, 1976, on the accrual *182 method of accounting. It reported no gross receipts or income from any source. The only deduction claimed was for $500,000 for minimum royalties. It reported an ordinary loss of $500,000. Further, on its closing balance sheet, it reported $5 of cash and no other liquid assets. Royale Properties filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1977 on the accrual method of accounting. It reported no gross receipts or other source of income and claimed the following deductions: $85,704 for interest; $500,000 for minimum royalties and $1,163 of legal and accounting fees. It reported an ordinary loss of $586,910. Further, on the closing balance sheet, it reported $1,019 of cash and no other liquid assets. Royale Properties filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1978 on the accrual method of accounting. It reported no gross receipts or other type of income and claimed the following deductions: $111,000 for interest; $775 for legal and accounting fees and $500,000 for royalties. It reported an ordinary loss of $612,208.Further, on its closing balance sheet, it reported $120 of cash and no other liquid assets. Royale Properties *183 filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1979 on the accrual method of accounting. It reported no gross receipts or other income and claimed the following deductions: $141,000 for interest; $1,220 for legal and accounting fees and $500,000 for royalties. It claimed no deductions for wages or salaries. It reported an ordinary loss of $642,740. Further, on its closing balance sheet, it reported $797 of cash and no other liquid assets. Royale Properties filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1980 on the accrual method of accounting. It reported no gross receipts or other income and claimed the following deductions: $171,000 for interest and $500,000 for royalties. It claimed no deductions for wages or salaries. It reported an ordinary loss in the amount of $671,500. Further, on its closing balance sheet, it reported $797 of cash and no other liquid assets. Titan Mining II, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable period beginning December 30, 1976, and ending December 31, 1976, on the accrual method of accounting. It reported no gross receipts or other income and claimed deductions *184 for $40,000 for payments to partners and $400,000 for royalties. It reported an ordinary loss of $441,886. Further, on its closing balance sheet, it reported $20,500 cash, no other liquid assets and the vast majority of its nondepletable assets consisted of notes receivable from its limited partners. Titan Mining II, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1977 on the accrual method of accounting. It reported no gross sales, $80,720 of interest income and an ordinary loss of $473,879 from a joint venture involving Titan Mining 75-1, Ltd. It claimed the following deductions: interest of $93,343; accounting fees of $1,861; legal fees of $5,350; travel expenses of $10,908 and royalties of $400,000. It reported an ordinary loss of $904,771. Further, on its closing balance sheet, it reported cash of $42,275, no other liquid assets and the vast majority of its nondepletable assets consisted of notes receivable from its limited partners. Titan Mining II, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1978 on the accrual method of accounting. It reported no gross sales, $66,223 of interest income and an ordinary *185 loss of $392,119 resulting from a joint venture with Titan Mining 75-1, Ltd. It claimed the following deductions: $109,973 for interest; accounting fees of $3,067 and minimum royalties of $335,000. It reported an ordinary loss in the amount of $774,859. Further, on its closing balance sheet, it reported no cash or liquid assets and the vast majority of its nondepletable assets consisted of notes receivable from its limited partners. Titan Mining II, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the taxable year 1979 on the accrual method of accounting. It reported no gross receipts but did report interest income $69,573, as well as an ordinary loss of $82,211 from a joint venture with Titan Mining 75-1, Ltd. It claimed the following deductions: $109,038 for interest; $5,761 for professional services and $335,000 for royalties. It reported an ordinary loss in the amount of $463,276. Further, on its closing balance sheet, it reported $12,304 of cash, no other liquid assets and the vast majority of its nondepletable assets consisted of notes receivable from limited partners. Titan Mining II, Ltd., filed a Form 1065, U.S. Partnership Return of Income, for the *186 taxable year 1980 on the accrual method of accounting. It reported no gross receipts, interest income of $12,490 and $54,598 of ordinary income from a joint venture with Titan Mining 75-1, Ltd. It claimed the following deductions: $105,284 for interest; professional services of $4,044 and royalties of $335,000. It reported an ordinary loss of $377,975. Further, on its closing balance sheet, it reported a negative cash balance of $15,137 and no other liquid assets. Petitioners, on their Federal income tax returns, claimed the following losses as their distributive shares of the partnership losses: Petitioner(s)
Partnership
Year
Amount
James R. Leach and
Carol S. Leach
Spadra Associates, Ltd.
1976
$8,656
Larry R. Killough and
Mary S. Killough
Spadra Associates, Ltd.
1976
17,313
Larry R. Killough and
Mary S. Killough
Spadra Associates, Ltd.
1977
19,222
Larry R. Killough and
Mary S. Killough
Spadra Associates, Ltd.
1978
16,824
Calvin Bracy and
Melinda M. Bracy
James Associates, Ltd.
1976
41,125
Calvin Bracy and
Melinda M. Bracy
James Associates, Ltd.
1977
44,390
Calvin Bracy and
Melinda M. Bracy
James Associates, Ltd.
1978
37,283
Jesse L. Wofford and
Mary R. Wofford
Titan Mining II, Ltd.
1976
16,923
Jesse L. Wofford and
Mary R. Wofford
Titan Mining II, Ltd.
1978
24,469
Catherine Williams
Royale Properties
1977
5,000
Catherine Williams
Royale Properties
1978
6,367
Audrey Ann Aldridge
Royale Properties
1976
10,000
Audrey Ann Aldridge
Royale Properties
1977
10,438
James H. Nettles and
Betsy M. Nettles
Royale Properties
1979
622
James H. Nettles and
Betsy M. Nettles
James Associates, Ltd.
1979
2,177
James H. Nettles and
Betsy M. Nettles
James Associates, Ltd.
1980
21,859
William G. Campbell and
Norma T. Campbell
James Associates, Ltd.
1979
21,774
William G. Campbell and
Norma T. Campbell
Royale Properties
1979
11,184
William G. Campbell and
Norma T. Campbell
James Associates, Ltd.
1980
1,151
William G. Campbell and
Norma T. Campbell
Royale Properties
1980
12,574
Jesse L. Wofford and
Mary R. Wofford
Titan Mining II, Ltd.
1977
30,031
*187 In the notices of deficiency mailed to petitioners, the Commissioner disallowed all or part of the distributive shares of the partnership losses claimed by petitioners on various grounds including: (1) that the deductions claimed by the partnerships for annual minimum royalties were not established to be for such purpose; (2) that the deductions claimed for annual minimum royalties were not established to be advanced royalties pursuant to a minimum royalty provision; (3) that the deductions claimed for royalties were not established to have been paid or incurred in a trade or business; (4) that the deductions claimed for interest were not established: to meet the definition of interest as defined in section 163; to have been paid or incurred in a trade or business; or to be ordinary and necessary business expenses; (5) that the nonrecourse notes lacked economic substance, had no value and did not constitute anything more than contingent liabilities; (6) that the deductions claimed for legal and accounting fees, consulting fees, travel expenses, and payments to partners were not established to be: ordinary and necessary business expenses; expenses incurred in a trade or *188 business; or noncapital expenditures; (7) that the losses claimed by petitioners exceeded their adjusted bases; (8) that the partnership transactions did not occur in fact or lacked economic substance; (9) that petitioners were partners not in the partnerships on or before October 29, 1976; and (10) that the amounts identified as royalties were not paid or accrued pursuant to a written agreement or lease that was binding prior to October 29, 1976. ULTIMATE FINDINGS OF FACT During the taxable years in issue, the activities of James Associates, Ltd., Spadra Associates, Ltd., Royale Properties and Titan Mining II, Ltd., were not engaged in for profit. During the taxable years in issue, the interest deductions claimed by James Associates, Ltd., Spadra Associates, Ltd., Royale Properties and Titan Mining II, Ltd., on nonrecourse indebtedness were too contingent to be deductible. OPINION The Commissioner disallowed, on a variety of grounds, all or part of the losses which petitioners claimed as their distributive shares of the partnership losses. The Commissioner's determinations are presumptively correct, Welch v. Helvering,290 U.S. 111, 115 (1933), *189 and petitioners have the burden of proving such determinations to be erroneous. Rule 142(a). We will first decide whether the partnerships were engaged in activities for the purpose of making a profit and, therefore, whether the deductions arising out of such activities should be disallowed under section 183. [5]
*190 Section 183(a) provides that if an individual does not engage in an activity for profit, the deductions attributable to such activity shall not be allowed except as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." If the activity is not engaged in for profit, then section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1). On petitioners' Federal income tax returns they deducted their proportionate shares of the ordinary losses reported by the partnerships. These ordinary losses result, in part, from *191 the following deductions, claimed by the partnerships, which respondent contends are subject to the aforementioned limitations of section 183: James Associates, Ltd.
Year
Deduction
Amount
1976
Annual minimum royalties
$1,002,950
Legal and accounting fees
15,283
Payments to partner
9,000
1977
Annual minimum royalties
1,039,008
1978
Annual minimum royalties
825,869
1979
Annual minimum royalties
812,500
1980
Annual minimum royalties
812,500
Spadra Associates, Ltd.
Year
Deduction
Amount
1976
Annual minimum royalties
$1,204,050
Legal and accounting fees
15,033
Payments to partners
8,000
1977
Annual minimum royalties
1,218,008
Guaranteed payments
20,000
Consulting fees
8,000
1978
Annual minimum royalties
969,669
Guaranteed payments
7,500
Consulting fees
8,000
Royale Properties
Year
Deduction
Amount
1976
Annual minimum royalties
$500,000
1977
Annual minimum royalties
500,000
Filing fees
18
Legal and accounting fees
1,163
Miscellaneous
19
Travel expense
6
1978
Annual minimum royalties
500,000
1979
Annual minimum royalties
500,000
1980
Annual minimum royalties
500,000
*192 Titan Mining II, Ltd.
Year
Deduction
Amount
1976
Annual minimum royalties
$400,000
Legal and accounting fees
1,886
Payments to partners
40,000
1977
Annual minimum royalties
400,000
Travel expense
10,897
1978
Annual minimum royalties
335,000
Loss from joint venture
392,119
Amortization
328
Depletion
320
Accounting fees
3,067
Travel expense
138
Miscellaneous
137
Investment Credit
1,960
A royalty interest, for Federal tax purposes, is a right to minerals in place that entitles the royalty owner to a specified fraction, in kind or in value, of the total production from the property, free of expense of development and operation. F. Burke and R. Bowhay, Income Taxation of Natural Resources, par. 2.03 (1985). Royalties are akin to rent, and are deductible as a trade or business expense under section 162(a)(3). Surloff v. Commissioner,81 T.C. 210, 232 (1983), and cases cited therein. Likewise, depreciation and amortization are allowable deductions only in the context of a trade or business of with respect *193 to property held for the production of income. Brannen v. Commissioner,722 F.2d 695 (11th Cir. 1984), affg. 78 T.C. 471 (1982). Similarly, investment tax credits require that the qualified property be acquired for use in a trade or business or be purchased for the production of income. Sec. 48(a). Legal, consulting and accounting fees, and travel and miscellaneous expenses are also generally allowable deductions only in the context of a trade or business or with respect to property held for the production of income. Secs. 162 and 212. Payments to partners are deductible only within the parameters of sections 162 and 212. Sec. 1.707-1(c), Income Tax Regs. Therefore, all the expenses listed in the charts above are generally deductible only pursuant to sections 162 or 212. The standard for determining whether an individual or a partnership is carrying on a trade or business or holding property for the production of income so that expenses are deductible under sections 162 or 212 is whether the individual or partnership is engaged *194 in the activity with the predominant purpose and intention of making a profit. Brannen v. Commissioner,supra;Surloff v. Commissioner,supra;Flowers v. Commissioner,80 T.C. 914, 931 (1983); Allen v. Commissioner,72 T.C. 28, 33 (1979). "Profit" in this context means economic profit, independent of tax savings. Surloff v. Commissioner,supra at 233. While a reasonable expectation is not required, the profit objective must be bona fide. Sec. 1.183-2(a), Income Tax Regs.; Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. by order (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Kratsa v. Commissioner,Hook v. Commissioner,Rosenblatt v. Commissioner,Leffel v. Commissioner, and Zemel v. Commissioner,734 F.2d 5-9 (3d Cir. 1984). The determination of whether the requisite intention exists is one of fact to be resolved on the basis of all the facts and circumstances. Flowers v. Commissioner,supra at 931-932; *195 Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). [6] Greater weight is given to objective facts than to the parties' mere statements of their intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). The burden of proving the existence of the requisite *196 intention rests with petitioners. Rule 142(a); Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Ramsay v. Commissioner,83 T.C. 793, 811 (1984). Whether a partnership is engaged in a trade or business or an activity for which deductions are allowable under paragraphs (1) and (2) of section 212--i.e, the question of whether or not it is an "activity * * * not engaged in for profit" within the purview of section 183--is determined at the partnership level. Siegel v. Commissioner,supra at 698; Brannen v. Commissioner,supra 78 T.C. at 505; Fox v. Commissioner,supra80 T.C. at 1006. Partnerships, however, present a special problem in applying section 183. When section 183 is applied to a partnership, the determination of its intent is considerably more complex than such determination in the case of an individual. Partnerships are mere formal entities. Obviously, they do not have independent minds of their own. *197 Nevertheless, in previous cases, we have constructed a "partnership intent" by reasoning backward from the numerous objective factors listed in section 1.183-2(b), Income Tax Regs., which are set forth above. See Wildman v. Commissioner,78 T.C. 943, 953-954 (1982); Siegel v. Commissioner,supra;Brannen v. Commissioner,supra;Hager v. Commissioner,76 T.C. 759 (1981); Fox v. Commissioner,supra.
After considering the record in light of the applicable standards associated with section 183, we conclude that petitioners have failed to carry their burden of proving that the partnerships were involved in activities engaged in for profit. Rule 142(a). Viewing the record as a whole, it is quite apparent that the partnerships were not operated with the predominant purpose and intention of making a profit from the mining and sale of coal. Brannen v. Commissioner,supra;Surloff v. Commissioner,supra.
Although the record is replete with evidence supporting our holding, several factors strongly suggest that no other *198 reasonable conclusion is permissible. The most telling factor is the manner in which the activities were conducted. Sec. 1.183-2(b)(1), Income Tax Regs. None of the partnerships ever caused any extensive geological studies to be made of the leased lands so as to definitively establish both the amount of coal contained therein and its minability. Further, the engineering report obtained from the "Selig Group" alerted the partnerships to numerous difficulties associated with mining the coal and suggested that additional testing would confirm lower reserves. Although we feel that the partnerships should have tested the properties before they embarked upon their mining endeavors, the failure of the partnerships ever to complete the necessary testing, especially after receiving the unfavorable engineering report from the "Selig Group," clearly demonstrates the unbusinesslike manner in which the partnerships were operated. Other evidence of the unbusinesslike manner includes extraordinary increases in royalty and lease bonus payments which would not result from arm's-length bargaining. According to the lease dated December 31, 1976, between Arkansas Real *199 Estate Company and SMA, Ltd., advance royalties approximating $9,500,000 were due. On the same day, SMA, Ltd., subleased the property to the four partnerships and the total amount of similar royalty and lease bonus payments now approximated $60,000,000. Further, the resulting royalty obligations with respect to the subleases also dwarfed other comparable leases in the area. SMA, Ltd., and the partnerships, were all controlled by David Kane; hence, the subleases do not reflect arm's-length negotiations. Such an extraordinary increase in royalties in a one-day period is additional evidence of the unbusinesslike nature in which the partnerships were operated. Additional evidence of the unbusinesslike nature is reflected in the partnerships' financial obligations. The record does not contain sufficient information to identify and trace all of the financial obligations of the partnerships through the maze of promissory notes. In many instances, the record does not indicate which notes pertain to the various obligations. Further, in many instances, the amounts of the notes do not coincide with any one specific obligation, thus compounding the difficulties in ascertaining what occurred *200 during the years in issue. In some instances, the partnerships executed nonrecourse promissory notes payable to SMA, Ltd., in excess of the amounts provided for in the applicable agreements. No satisfactory explanation was submitted for such unusual activities. In other instances, the partnerships claimed interest deductions in excess of that due under the applicable obligations. The record contains numerous instances in which financial obligations between business entities controlled by Mr. David Kane became due and there is no satisfactory proof of payment. According to the provisions of such obligations, failure to pay such debts should bring about foreclosure upon the properties. This did not occur. Due to petitioners' failure to prove satisfactorily that the required payments were made between business entities under common control, the validity of the underlying obligations is also questionable, thus further demonstrating the unbusinesslike nature of the partnerships' operations. Several of the leases, i.e., the James AB, Spadra AB, Titan AB and Royale AB leases, provide for two distinct schedules for advance royalties and two distinct schedules for lease bonuses. In *201 each case, the amounts for Tract B greatly exceed those for Tract A. Although this facet alone does not seem extraordinary, it reflects an unbusinesslike approach when no specific parcels of real property are identified as Tracts A and B, as in the cases of all the subleases in question. Another factor indicating the lack of a profit-seeking motive concerns the absence of individuals associated with a project of this magnitude who possessed sufficient practical experience and knowledge of coal mining operations. Sec. 1.183-2(b)(2), Income Tax Regs. We were not impressed by any individual associated with the partnerships once their qualifications were thoroughly examined in light of their tenure and accomplishments with the partnerships. The lack of qualified individuals associated with the partnerships clearly demonstrates both the unbusinesslike nature of these organizations and the lack of the requisite profit-seeking motive. The third factor listed in section 1.183-2(b), Income Tax Regs., i.e., the time and effort expended in carrying on the activities, offers little support to petitioners' unfounded assertion that the *202 partnerships were operated with the requisite profit motive. Aside from a few specific instances indicating that time and effort was expended, we are more concerned with the vague and unsubstantiated recollections of time and effort which account for large portions of the relevant time periods. Given the magnitude of the proposed operations of the partnerships, if they really intended to operate them with the requisite profitseeking motive, then considerably more explanation and documents should be available concerning the time and efforts expended. Petitioners' failure to adequately prove such alleged activities, when they clearly have the burden of proof, permits us to infer that no additional evidence exists to support their position. Cf. Wichita Terminal Elevator Co. v. Commissioner,162 F.2d 513 (10th Cir. 1947). Another factor relevant in the determination of whether the partnerships were operated with the requisite profit-seeking objective is the expectation that assets used in the activity may appreciate in value. Sec. 1.183-2(b)(4), Income Tax Regs. Although petitioners produced some general evidence that the price of coal *203 was expected to follow the price of oil upward, no specific evidence was introduced concerning the coal fields in issue. The properties of coal can vary greatly as to its sulphur and ash content and other chemical content. In addition, transportation problems affect the general overall marketability of coal from a specific field. Viewing the record as a whole, petitioners have failed to substantiate their unsupported assertions that the coal fields in issue contained the type of coal in demand and that such fields would, in fact, appreciate in value. With respect to the success of the partnerships in similar or dissimilar activities, the record contains no evidence indicating that these partnerships or the general partners thereof had any success in coal mining operations. Mr. Campbell, who was employed by the group of corporations controlled by David Kane and is also a petitioner, testified that the corporations controlled by Mr. Kane were successful syndicators and operators of real estate and oil and gas ventures. After observing his demeanor and considering his pecuniary interest in these cases, however, we decline to accept his unsubstantiated claims of success. Due to *204 the absence of credible corroborating evidence to support such claims, petitioners have failed to demonstrate satisfactorily their claims of success in similar or dissimilar activities. Two other factors which the regulations identify as relevant considerations in determining a profit objective are the history of income or losses with respect to the activity and the amount of occasional profits, if any, which are earned. Sec. 1.183-2(b)(6) and (7), Income Tax Regs. All of the partnerships generated huge ordinary losses during the taxable years in issue. Further, petitioners candidly admit that "none of the partnerships ever generated any economic profits." Although limited mining activities on several of the leases generated a total gross profit of less than $150,000 during both 1977 and 1978, these gross profits do not even begin to approach the massive ordinary losses which they incurred. During the years in issue, the losses totalled over $12,000,000. During many of the years in issue, many of the partnerships reported no gross income from mining. After examining all of the relevant financial date with respect to these two factors, we are convinced that the data merely confirms *205 our conclusion that the partnerships were not engaged in activities for profit for the taxable years in issue. The final relevant criteria contained in the regulations is the financial status of the partnerships. Sec. 1.183-2(b)(8), Income Tax Regs. After a thorough review of the financial data associated with the subject parnerships, including an analysis of the obligations due from related entities, we are convinced that this factor offers no significant support to petitioners' position concerning whether the profit motive was present. In June 1983, the law firm, of which petitioners' counsel are members, engaged an engineering and construction firm for the preparation of a feasibility study (hereinafter referred to as the "Parsons study") concerning the mining of coal on the subject coal fields. Although the Parsons study was begun in 1984, it was to reflect the feasibility of a mining operation on the subject coal fields as of 1976 and was to be based upon data and technology available in 1976. In several instances, however, the study incorporated post-1976 data, thus diminishing the overall reliability of the study. The Parsons study concludes *206 with an income statement showing profitable activities for the four partnerships under varying assumptions. These income statements, however, are based upon and contain numerous inaccuracies which seriously question the accuracy and professionalism of the study. These include: a failure to accurately reflect all relevant royalties due under the leases; a failure to discuss how the partnerships would be able to continue to make the required royalty payments prior to actual production by that partnership; and the failure to accurately reflect all interest and other costs associated with the project. Based upon these and other defects, the final financial figures contained in the Parsons study, including its projected mining costs of approximately $11 per ton of coal, are illusory. Further, the Parsons study does not contain a cash flow analysis which is essential to a project of this magnitude and duration. The income statement contained in the Parsons study assumes an annual production rate of 900,000 tons of coal. The total production of coal in Arkansas in 1976 was 534,000 tons. Further, although the Parsons study proposes blending the semianthracite coal from the Scranton coal *207 field with bituminus coal, no established market for such blended coal existed at that time. Also, the marketing section of the study is seriously flawed and based upon numerous unsupported assumptions which seriously undermine its accuracy. It also fails to adequately address the transportation costs in light of identifiable and known markets for the coal from the subject fields.Finally, the portions of the Parsons study pertaining to the geology and mining difficulties associated with the coal on the subject property are incomplete and, in portions thereof, inaccurate. The study glosses over significant faulting and associated mining problems which were apparent in 1976. The Parsons study, which was supposed to corroborate the fact that successful mining operations could have been commenced on the subject properties in 1976, is a seriously flawed and unprofessional work product; hence, it is entitled to little weight. Although the lengthy study is neatly packaged, incorporates the relevant language, contains numerous charts, graphs and maps and generally looks impressive, a close inspection reveals the aforementioned shortcomings which we conclude are significant. As a whole, *208 we were not impressed by the analyses contained in the study. A project of this magnitude (assuming, of course, that the requisite profit objective is present) should be capable of analysis in an accurate, detailed, candid and professional study. Instead, we are confronted with what can only be described as window dressing to a pipe dream which was purchased by petitioners for use at this trial. Given our holding that the partnerships' activities were "not engaged in for profit" within the purview of section 183, and are not, therefore, entitled to deductions for royalties, we need not decide whether the nonrecourse notes, or what portions of the cash royalties paid by the partnerships, qualify for deduction. Surloff v. Commissioner,supra at 239. The remaining deductions in issue are subject to the limitations contained in section 183. The next issue for decision is whether the partnerships are entitled to certain interest deductions claimed with respect to their coal mining activities which were disallowed by the Commissioner. Respondent, inter alia, asserts that the deductions are not allowable because the obligations in issue were shams, were too contingent *209 in nature, and did not provide for interest as defined in section 163. Petitioners claim otherwise. After thorough consideration of the parties' arguments in light of the record, we conclude that petitioners have failed to carry their burden of proving that the interest deductions in issue are allowable. Rule 142(a). Section 163(a) provides that "there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." "Interest" is the amount which one has contracted to pay for the use of borrowed money. Old Colony Railroad Co. v. Commissioner,284 U.S. 552 (1932). In order for interest to be deductible under section 163(a), it must be paid on genuine indebtedness. Knetsch v. United States,364 U.S. 361 (1960); Narver v. Commissioner,75 T.C. 53, 98 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982). Where transactions lack substance and are entered into solely to form the basis of a tax deduction, they need not be recognized. Battelstein v. Internal Revenue Service,611 F.2d 1033, 1035 (5th Cir. 1980). *210 Petitioners must prove that the obligations in issue created a bona fide debt and this is a question of fact. Rule 142(a). In Fox v. Commissioner,80 T.C. at 1019-1021, we succinctly summarized several standards which courts may utilize to determine whether genuine indebtedness is present as follows: There are various approaches which may be taken in establishing whether a purchaser may treat a nonrecourse liability as a bona fide debt. One, originating in Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), indicates that when the amount of the aggregate purchase price unreasonably exceeds the value of the property securing the note (or when the principal amount of the note unreasonably exceeds the value of the property securing the note), the debt will not be recognized. In such instance, the purchaser acquires no equity in the property by making payments and, therefore, would have no economic incentive to pay off the note. Estate of Franklin v. Commissioner,supra at 1048-1049. The Estate of Franklin analysis, comparing the purchase price and size of the note *211 to the fair market value of the property at the time of purchase, originated in real estate transactions (see Estate of Franklin v. Commissioner,supra;Narver v. Commissioner,75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); Beck v. Commissioner,74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982)), but has also been applied to the purchase of cattle (see Hager v. Commissioner,supra), and, more recently, to movies (see Wildman v. Commissioner,supra;Siegel v. Commissioner,supra;Brannen v. Commissioner,supra). Another line of cases, in many ways complimentary to the above, more closely addresses the problem of bona fide loans where the sole security for such loans is a speculative asset with an undeterminable value at the time of purchase. This line of decisions holds that highly contingent or speculative obligations are not recognized for tax purposes until the uncertainty surrounding them is resolved. CRC Corp. v. Commissioner,693 F.2d 281 (3d Cir. 1982), revg. *212 and remanding on other grounds Brountas v. Commissioner,73 T.C. 491 (1979); Brountas v. Commissioner,692 F.2d 152, 157 (1st Cir. 1982), vacating and remanding on other grounds 73 T.C. 491 (1979); Gibson Products Co. v. United States,637 F.2d 1041 (5th Cir. 1981); Denver & Rio Grande Western R.R. Co. v. United States,205 Ct. Cl. 597, 505 F.2d 1266 (1974); Lemery v. Commissioner,52 T.C. 367, 377-378 (1969), affd. on another issue 451 F.2d 173 (9th Cir. 1971); Inter-City Television Film Corp. v. Commissioner,43 T.C. 270, 287 (1964); Albany Car Wheel Co. v. Commissioner,40 T.C. 831 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964). * * * [Fn. ref. omitted.] Upon thorough consideration of all of the relevant evidence, we are convinced that as a practical matter, the payment of the nonrecourse notes in issue was contingent upon the successful development and mining of coal from the leased lands, an extremely dubious prospect at best. Given that the aforementioned discussion of the activities of the partnerships *213 in this regard have conclusively shown that they were "activities not engaged in for profit," it is quite apparent that the interest deductions in issue are also subject to the rule that interest on speculative or contingent liabilities may not be accrued and deducted. CRC Corp. v. Commissioner,693 F.2d 281 (3d Cir. 1982); Fox v. Commissioner,supra. The nonrecourse notes lacked economic substance. Surloff v. Commissioner,supra;Battelstein v. Internal Revenue Service,supra.Accordingly, as petitioners have failed to carry their burden of proof with respect to this issue, the Commissioner's disallowance of the interest deductions is sustained. Rule 142(a). The next issue for decision is whether the partnerships are entitled to any deductions under section 183(b) for legal, accounting and consulting fees, payments to partners, guaranteed payments, and travel and miscellaneous expenses which were disallowed by the Commissioner on a variety of grounds. Petitioners failed to present sufficient detailed and specific evidence concerning the nature of such expenses and, in many instances, failed to *214 show that such expenses were, in fact, paid during the years in issue. Further, petitioners did not address such matters in their briefs. Petitioners have clearly failed to carry their burden of proof; accordingly, the determinations of the Commissioner are sustained. Rule 142(a). The Commissioner also challenged petitioners' deductions of their distributive share of the losses generated by the partnerships during the years in issue on the ground that the losses exceeded petitioners' bases of their partnership interests. Again, petitioners failed to present sufficient detailed and specific evidence and did not address the issue in their briefs. Accordingly, petitioners have failed to carry their burden of proof, and the determinations of the Commissioner are sustained. Rule 142(a). Finally, as petitioners failed to present any evidence concerning the investment tax credit claimed by Jesse L. Wofford for the taxable year 1978 or the Titan Mining II, Ltd., loss from the joint venture with Titan Mining, Ltd. 75-1 during 1978, no credit or loss is allowed. Rule 142(a). Decisions will be entered for the respondent in docket Nos. 14004-82, 1712-84, 18613-84, 18881-84, 18882-84, 18883-84, 18884-84, 18885-84, 18886-84, 18887-84, and *215 18888-84.
Appropriate orders will be issued in docket Nos. 22367-83 and 25482-83.
Footnotes
1. Cases of the following petitioners were consolidated for trial, briefing and opinion: William G. Campbell and Norma T. Campbell, docket No. 22367-83; James H. Nettles and Betsy M. Nettles, docket No. 25482-83; Jesse L. Wofford and Mary R. Wofford, docket No. 1712-84; James R. and Carol S. Leach, docket No. 18613-84; Calvin M. Bracy and Melinda M. Bracy, docket No. 18881-84; Catherine Williams, docket No. 18882-84; Larry R. and Mary S. Killough, docket No. 18883-84; Calvin and Melinda M. Bracy, docket No. 18884-84; Audrey Ann Aldridge, docket No. 18885-84; Larry Killough and Mary Killough, docket No. 18886-84; Audrey Ann Aldridge, docket No. 18887-84; and Catherine Williams, docket No. 18888-84.↩
2. With respect to those cases with docket Nos. 22367-83 and 25482-83, certain issues have been severed for purposes of trial. It will be necessary to try those issues separately unless the parties are able to reach a settlement, in which case a Rule 155 computation may be necessary. ↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all rule references are to this Court's Rules of Practice and Procedure.↩
4. A fault is a fracture in the earth's crust, with displacement of one side of the fracture with respect to the other.↩
5. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩.
6. Some of the relevant factors to be considered in determining whether an activity is engaged in for profit are (1) the manner in which the taxpayer carried on the activities; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of the occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs.↩